Mary DALE, Plaintiff,

v.

William J. KELLEY, Individually and in his Official Capacity as Assistant District Attorney for the County of Livingston, Charles J. DiPasquale, Individually and in his Official Capacity as Chief of the Mount Morris Police Department, County of Livingston, and Village of Mt. Morris, Defendants.

No. 94–CV–6444L.

United States District Court,
W.D. New York.

Dec. 6, 1995.

**130**

Robert B. Koegel, Rochester, NY, for Mary Dale.

Scott H. Smith, Bayer and Smith, Rochester, NY, for William J. Kelley, County of Livingston.

Igor Shukoff, Fix, Spindelman, Turk, Himelein & Shukoff, Rochester, NY, for Charles J. DiPasquale, Village of Mt. Morris.

## DECISION AND ORDER

LARIMER, District Judge.

### BACKGROUND

Plaintiff, Mary Dale ("Dale"), commenced this action pursuant to 42 U.S.C. § 1983 against defendants William J. Kelley ("Kelley"), an Assistant District Attorney for Livingston County; Charles J. DiPasquale ("DiPasquale"), Chief of the Village of Mount Morris Police Department; the Village of Mount Morris ("the Village"); and Livingston County ("the County"). Plaintiff claims that she was subject to false arrest and malicious prosecution for perjury as a result of testimony she gave at a felony hearing conducted in Mount Morris Village Court on June 16, 1993.

Before the Court are the parties' cross-motions for summary judgment. Plaintiff has moved for summary judgment only on the issue of liability against Kelley and DiPasquale.

Defendants have moved for summary judgment claiming that Kelley and DiPasquale have absolute immunity from suit, or in the alternative, that Kelley has qualified immunity. Additionally, defendants contend that the Village and the County are not vicariously liable for the conduct of DiPasquale and Kelley.

### FACTS

The essential facts are not in dispute. Plaintiff owned a bar, the B & B Grill ("the bar"), located in Mount Morris, Livingston County, New York. Plaintiff has a son, Deforrest Henry Dale, nicknamed "J.R." ("J.R."). On June 14, 1993 at approximately 1:00 a.m., J.R. was arrested in the basement of the bar after closing time by the Mount Morris police and was charged with third-degree burglary.

The following day, plaintiff appeared at the Mount Morris Police Department and was served with a subpoena compelling her to testify at J.R.'s felony hearing on June 16. On June 16 plaintiff appeared at J.R.'s hearing, which was held at the Village Court of Mount Morris. Kelley presented the state's case against J.R., and DiPasquale acted as court officer.

One of the issues that Kelley attempted to prove during the hearing was that J.R. did not have permission to be in the bar after closing time. To establish this, Kelley called as witnesses two bartenders and a Mount Morris police officer who participated in J.R.'s arrest.

Tracy Calkins, a bartender, testified that she had been given instructions that J.R. "was not allowed to be in there after I locked the doors." Transcript of Felony Hearing ("Tr.") at 8. Calkins was not asked, however, who had given her those instructions.

Likewise, Laurie Sawdey, another bartender, testified that J.R. "was allowed in the bar but not after closing." Tr. at 12. During Sawdey's testimony, Kelley attempted to establish that plaintiff was the one who had given Sawdey instructions regarding J.R. However, after the court sustained a hearsay objection, Sawdey was only able to testify as to what "the policy" was with regard to J.R., without attributing that policy to any particular person.

Sergeant Patrick Moran of the Mount Morris Police Department also testified. Over a hearsay objection, he stated that he learned from a conversation with plaintiff that J.R. was not allowed in the bar after closing time. Tr. at 39.

Before calling plaintiff to testify, Kelley escorted her outside of the courtroom and spoke to her. The substance of the conversation is in some dispute. Kelley returned to

the courtroom and called plaintiff as a witness.

Plaintiff testified that she had never told Calkins that J.R. was not allowed in the bar after closing. Tr. at 44. Plaintiff also stated that she had told Sawdey, the other bartender, that she "would prefer him [J.R.] not to be [in the bar after closing] but I changed my mind." Tr. at 45. As to Moran, plaintiff testified that she could not remember what she had told him, because she had spoken to him on the phone after she had been roused from sleep. She did remember telling Moran that she would be down the following day to speak with him, but that she would not press charges. Tr. at 45–46.

On cross-examination, plaintiff specifically stated that J.R. had her permission to be in the bar at the time of the incident for which he was arrested. Tr. at 49.

Immediately after plaintiff finished testifying, Kelley directed DiPasquale to take plaintiff into custody. DiPasquale responded, "For what?" Kelley answered, "The charge will be perjury in the first degree."

DiPasquale then escorted plaintiff from the courtroom into an adjoining room where she was confined. Later that day, plaintiff was served with a felony complaint alleging that plaintiff had committed first-degree perjury by offering testimony which contradicted prior sworn testimony of three witnesses. DiPasquale was the complaining witness on the complaint.

Plaintiff was then handcuffed and driven to the Village Court of Nunda for arraignment. Kelley appeared at plaintiff's arraignment and requested that plaintiff be held without bail pending her felony hearing. The request was granted.

Plaintiff was then taken to the Livingston County holding facility in Geneseo, where she was processed and subjected to a full-body strip search. Later that evening plaintiff was taken to the Monroe County Jail in Rochester where she spent the night. She was released on bail the next day.

On November 10, 1993, a Livingston County grand jury dismissed the first-degree perjury charge against plaintiff. Plaintiff then filed this action for false arrest and malicious prosecution.

### DISCUSSION

### I. General Principles

■ Summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991). Where both sides have moved for summary judgment, each party's motion must be evaluated on its own merits, and all reasonable inferences must be drawn against the party whose motion is under consideration. *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir.1981).

■ Whether there are any material issues of fact in this case must be determined with reference to the law in New York relating to false arrest[1] and malicious prosecution. To establish a claim for false arrest, plaintiff must show that: (1) the defendants confined her; (2) she was conscious of the confinement; (3) she did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). The elements of a malicious prosecution claim are: (1) the commencement or continuation of a criminal proceeding by the defendants against the plaintiff; (2) the termination of the proceeding in favor of the accused; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice. *Id.* at 457, 373 N.Y.S.2d 87, 335 N.E.2d 310.

Here the essential facts are not in dispute. Several witnesses had either explicitly stated, or clearly implied, that plaintiff had told them that J.R. did not have her permission to be in the bar after closing time. Plaintiff then stated unequivocally that J.R. did have

1. Although the complaint alleges both false arrest and false imprisonment, the two terms are virtu-

ally synonymous under New York law. *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir.1991).

**132**

such permission. Kelley then had plaintiff arrested on the spot for first-degree perjury.

## II. Claims Against Kelley

### A. Absolute Immunity?

■■■ Kelley argues that his conduct is protected by absolute immunity. In determining whether absolute or qualified immunity applies to a given situation, the Court looks to the function being performed rather than to the office or identity of the defendant. *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995); *see Buckley v. Fitzsimmons,* —— U.S. ——, ——, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993). State prosecutors are absolutely immune from actions resulting from conduct " 'intimately associated with the judicial phase of the criminal process.' " *Hill,* 45 F.3d at 660–61 (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976)). Thus, prosecutors are protected by absolute immunity from civil liability for initiating a prosecution and presenting the case at trial. *Hill,* 45 F.3d at 661 (citing *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995–96; *Buckley,* —— U.S. at ——, 113 S.Ct. at 2615). They are also absolutely immune for conduct in preparing for those functions (*e.g.* evaluating and organizing evidence for presentation), or determining which offenses are to be charged. *Id.* In short, "prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.' " *Id.* (quoting *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994)).

■■■ On the other hand, the actions of a prosecutor are not protected by absolute immunity merely because they are performed by a prosecutor. *Buckley,* —— U.S. at ——, 113 S.Ct. at 2615. Prosecutors receive, at most, qualified immunity before any formal legal proceeding has begun. *Hill,* 45 F.3d at 661. Thus, "advising the police during the investigative stage of a case that they

have probable cause to arrest" is not an advocacy function and is not entitled to absolute immunity. *Id.* In *Hill,* as in the present case, the Assistant District Attorney had directed the police officer to arrest plaintiff.

■■■ As to the false arrest claim, while the arrest and subsequent legal proceedings which took place in the present case were not preceded by a lengthy "investigative stage," the circumstances in which Kelley decided to direct DiPasquale to arrest plaintiff were, for immunity purposes, the same as an investigative stage. As soon as plaintiff finished testifying, Kelley told DiPasquale to "take Mrs. Dale into custody,"[2] to which DiPasquale responded, "For what?" At that time, Kelley informed DiPasquale that the charge would be first-degree perjury. That is tantamount to Kelley's informing DiPasquale that he had probable cause to arrest plaintiff.

I conclude, therefore, that on the false arrest claim, Kelley is not entitled to absolute immunity, but at most to qualified immunity. *See Day v. Morgenthau,* 909 F.2d 75, 76, 78 (2d Cir.1990).

■■■ It is clear, however, that insofar as the malicious prosecution claim is concerned, Kelley is absolutely immune from liability. "Case law from this circuit clearly establishes that the district attorney['s] activities with respect to the malicious prosecution claim . . . are covered by absolute immunity." *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1149 (2d Cir.1995). *See also Imbler,* 424 U.S. at 431, 96 S.Ct. at 995–96.

### B. Probable Cause and Qualified Immunity.

■■■ Whether Kelley can be held liable for false arrest, however, involves two different issues: probable cause and objective good faith. "[T]he question of immunity remains, as it should, distinct from the question of probable cause." *Warren v. Dwyer,* 906 F.2d 70, 75 (2d Cir.) (citation omitted), *cert.*

---

**2.** The fact that this incident took place during a courtroom proceeding in another matter is, of course, of no moment with regard to Kelley's immunity in this case. In other words, while Kelley may have absolute immunity with regard to his conduct during the proceedings against

J.R., a separate action began against plaintiff when Kelley instructed DiPasquale to take her into custody. That incident, with respect to plaintiff, did not occur during the prosecutorial stage of *her* case.

*denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

 The reason for this is simple. If there was probable cause for plaintiff's arrest, Kelley could not be held liable for false arrest, since the arrest would be expressly authorized by statute; *see* N.Y.C.P.L. § 140.10. Only if probable cause was lacking would the issue arise whether Kelley could have had a good-faith belief that he had probable cause for plaintiff's arrest. *See Warren,* 906 F.2d at 75 (evidence might show that probable cause for arrest was lacking, without a showing it was unreasonable for defendant to mistake the existence of probable cause at the time).

The issue, then, is two-fold. First, did Kelley have probable cause to believe that plaintiff had committed perjury, and, therefore, that she could lawfully be arrested for that charge? If so, he is not liable and that ends the matter. If not, the question is whether the evidence is sufficient for a jury to find that, viewed objectively, Kelley could not reasonably have thought that he had probable cause. If a jury could not so find, Kelley enjoys qualified immunity.

### 1. *Probable Cause To Arrest For Perjury.*

 The Fourth Amendment (through the Fourteenth Amendment) protects citizens against "unreasonable searches and seizures" by the State. Probable cause must exist before a warrantless arrest may be effected. The test for determining probable cause is not a rigid formula, but an elastic one that depends on the facts and circumstances of each case.

 Probable cause exists when the authorities "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Jenkins,* 876 F.2d 1085, 1089 (2d Cir.1989) (citations and internal quotation marks omitted); *see Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 861–62, 43 L.Ed.2d 54 (1975). Reasonable cause to arrest a person under New York law is sub-stantially the same as under the Fourth Amendment. *Raysor v. Port Authority of New York & New Jersey,* 768 F.2d 34, 39 (2d Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986).

 Although an arrest cannot be based on a mere hunch, *United States v. Patrick,* 899 F.2d 169, 174 (2d Cir.1990), "a probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd,* 52 F.3d 310 (2d Cir. 1995). "In fact, the eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Id.* (citing *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)).

 "Where the underlying facts are not in dispute, whether the set of facts within the knowledge of the [defendant] constituted probable cause is a question of law." *Dirienzo v. United States,* 690 F.Supp. 1149, 1155 (D.Conn.1988); *see also Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995) (district court properly directed verdict on question of probable cause). Again, this is true under New York law as well. *Veras v. Truth Verification Corp.,* 87 A.D.2d 381, 451 N.Y.S.2d 761 (1st Dep't) (where facts leading up to arrest are undisputed, existence of probable cause is for court to make as a matter of law), *aff'd,* 57 N.Y.2d 947, 457 N.Y.S.2d 241, 443 N.E.2d 489 (1982).

In this case, there is no dispute as to the facts. The record reveals what the plaintiff and the other witnesses stated in their testimony prior to plaintiff's arrest. Thus, the court can decide this issue as a matter of law.

Plaintiff was arrested for perjury in the first degree. Under New York Penal Law § 210.15, a "person is guilty of perjury in the first degree when he swears falsely and when his false statement (a) consists of testimony, and (b) is material to the action, proceeding or matter in which it is made."

There is no dispute that plaintiff was testifying. Nor can there be any dispute here that her testimony concerning whether J.R. was allowed to be in the bar after closing was material. Under New York law, a statement is material if it reflects on the matter under consideration, and it need not directly prove the fact in issue. *People v. Davis,* 53 N.Y.2d 164, 171, 440 N.Y.S.2d 864, 423 N.E.2d 341 (1981). In the present case, plaintiff was testifying about a central issue in the case: whether J.R. had permission to be in the bar—in other words, whether he was there lawfully or unlawfully. It is clear, therefore, that as a matter of law plaintiff's testimony was material.

The central issue left for the court to decide with regard to the perjury charge, then, is whether Kelley had probable cause to believe that plaintiff had made a false statement.

Calkins testified that J.R. "was not allowed to be in there after I locked the doors." Kelley did not ask, and Calkins did not state, who had given her those instructions. Plaintiff testified that she had never told Calkins that J.R. was not allowed in the bar after closing.

Sawdey testified that bar policy was that J.R. "was allowed in the bar but not after closing." Plaintiff testified that she had told Sawdey that she "would prefer him not to be [in the bar after closing] but I changed my mind."

Lastly, Moran testified that he had learned from his conversation with plaintiff that J.R. was not allowed in the bar after closing. When asked about that conversation, plaintiff testified that she could not remember what she had told Moran, except that she told him that she would not press charges against her son. Plaintiff did explicitly testify, however, that J.R. had her permission to be in the bar after closing.

Based on these undisputed facts, I find that there was probable cause to arrest plaintiff for perjury. Kelley is therefore entitled to summary judgment in his favor.

Although arguably none of plaintiff's statements was literally inconsistent with the testimony of the other witnesses, there was certainly a basis for believing that plaintiff was not telling the truth when she said under oath that she had given J.R. her permission to be at the bar when it was closed.

First, there was the testimony of Moran that he had learned from speaking to plaintiff that J.R. was not allowed to be in the bar after closing time. Although the question to Moran was couched in terms of what he "learned" rather than what plaintiff said (probably to overcome a hearsay objection), the obvious import of his testimony was that plaintiff had told him affirmatively that J.R. was not allowed to be in the bar when it was closed. Plaintiff's testimony that she did not remember whether she told Moran anything about this subject, given her memory of other things that she told Moran, could certainly have seemed deliberately evasive on this point.

If that were the only testimony other than plaintiff's, it would likely amount to no more than a conflict between the testimony of two witnesses, which would not by itself support a finding of perjury. *United States v. Bortnovsky,* 879 F.2d 30, 33 (2d Cir.1989). However, there was also the testimony of Calkins and Sawdey to corroborate Moran's testimony.

When asked whether she had been "given any instructions regarding Mr. Dale's presence in the bar," Calkins stated that "[h]e was not allowed to be in there after I locked the doors." Tr. at 8. Sawdey, asked what "the policy" was concerning J.R., said that he "was allowed in the bar but not after closing." Tr. at 12.

Although neither of these witnesses stated that plaintiff had told them not to let J.R. stay in the bar after closing, that was the obvious inference to be drawn from their testimony, particularly after plaintiff had testified. Plaintiff stated that she was the owner of the B & B Grill and that no one else had any ownership interest in the bar. Tr. at 47. Presumably, then, plaintiff would have been the person to set bar "policies" and to instruct the bartenders on who would be allowed in the bar and at what times.

Plaintiff's own testimony was also in conflict with Calkins' and Sawdey's in other

ways. Plaintiff stated that she had "never" told Calkins that J.R. should not be on the premises after the bar was closed. Tr. 44. Again, though Calkins did not explicitly state that plaintiff had told her that, that was the logical inference to be drawn from the testimony.

Plaintiff also said that she had told Sawdey "that I would prefer him not to be [in the bar] but I changed my mind." Tr. at 45. Sawdey, however, stated that "the policy" was that J.R. should not be allowed in the bar; she gave no indication that that policy had ever been changed. The only way to reconcile plaintiff's and Sawdey's testimony, then, would be to assume that plaintiff never communicated to Sawdey that she had "changed her mind" in this regard. That would hardly be credible, however. It would make no sense for plaintiff to decide to let J.R. be in the bar after closing but not to tell the bartenders, who were responsible for enforcing such rules. Under the circumstances, then, plaintiff's statement about changing her mind could well have appeared to be no more than a rather obvious attempt to explain away Sawdey's unequivocal testimony about bar policy.

■■■ This is not to say that this evidence would have been sufficient to sustain a *conviction* for perjury by proof beyond a reasonable doubt. That standard, however, is not what Kelley must show to defeat plaintiff's claim against him. He need only show that he had probable cause to arrest, which is a much less stringent standard than the reasonable-doubt standard applied to criminal convictions. A "mere probability of criminal activity" will suffice. *Patrick*, 899 F.2d at 174.

In my view, there was probable cause for the arrest. As explained above, three witnesses either explicitly stated, or very strongly implied, that plaintiff had told them that J.R. was not authorized to be in the bar after closing. The only testimony to the contrary was from plaintiff herself, whose own testimony, with its selective memory about what she said and her purported "change of mind" about J.R. being in the bar, could certainly have appeared less than credible. The evidence before Kelley may not

have been enough to convict plaintiff of perjury, but it was enough to warrant a reasonable person in believing that plaintiff had committed the offense with which she was charged. *Jenkins*, 876 F.2d at 1089. *See Dees v. City of Miami*, 747 F.Supp. 679, 684–85 (S.D.Fla.1990) (where admitted killer of murder victim had told police that plaintiff knew of the shooting and agreed to cover it up, reasonable officer could have determined that probable cause existed to arrest plaintiff for perjury based on plaintiff's denial of knowledge or involvement in shooting).

### 2. *Qualified Immunity.*

As noted earlier, the presence of probable cause to arrest plaintiff means that Kelley cannot be held liable for false arrest. Even if probable cause were lacking, however, I find that Kelley would be entitled to qualified, good-faith, immunity as a matter of law.

■■■ In determining whether an official is entitled to qualified immunity, the focus is on "objective circumstances rather than an officer's subjective motivation." *Bradway v. Gonzales*, 26 F.3d 313, 319 (2d Cir.1994) (citation omitted). Under this standard, officials are entitled to qualified immunity when their decision was objectively reasonable, even if mistaken. *Castro v. United States*, 34 F.3d 106, 112 (2d Cir.1994) (citing *Hunter v. Bryant*, 502 U.S. 224, 228–29, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)).

■■■ Qualified immunity "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir.1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)), *cert. denied*, —— U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "Under qualified immunity, a government official may claim immunity from suit only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful." *Hill*, 45 F.3d at 663.

"Since qualified immunity is intended to protect government officials from the harassing and expensive burdens of litigation as well as the threat of monetary damages, courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by qualified immunity." *Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir.1995). In fact, the Supreme Court has stated that issues involving the defense of qualified immunity should ordinarily be decided "at the earliest possible stage in litigation." *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536. *See also Castro,* 34 F.3d at 112 (defense of qualified immunity "often can and should be decided on a motion for summary judgment").

■ As with probable cause, then, where the facts are undisputed, the issue of qualified immunity may be decided by the court as a matter of law. *Oliveira,* 23 F.3d at 649; *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990); *Warren,* 906 F.2d at 75. Although this defense involves fact issues which in many contexts requires the jury's resolution, "[t]he rule requiring the judge to resolve questions of reasonableness on summary judgment in qualified immunity cases where the material facts are not in dispute is consistent with the doctrine's purpose of providing immunity from suit, as well as a defense to liability." *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995).

■ Again, probable cause and immunity are separate issues. Even if probable cause is lacking, summary judgment is appropriate if "a rational jury could *not* find that the [defendant's] judgment was so flawed that no reasonable [district attorney] would have made a similar choice." *Id.* at 424–25.

■ One basis upon which a qualified immunity defense can be established is by showing that the right allegedly violated was not clearly established at the time of the acts in question. If the right was not clearly established, no rational jury could find that the defendant could not reasonably have thought that his actions were consistent with the law. Therefore, "[s]ummary judgment is particularly appropriate when the qualified immunity defense is based on a showing that

an asserted right was not clearly established since the inquiry as to whether a right was or was not clearly established is 'solely a question of law.' " *Rodriguez,* 66 F.3d at 475 (quoting *Weaver v. Brenner,* 40 F.3d 527, 532 (2d Cir.1994)).

■ In determining whether a right was clearly established, the court should look to whether the right was defined with reasonable specificity; whether decisional law of the applicable courts supported its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful. *Id.* at 476; *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

■ In the case at bar, unquestionably the right not to be subjected to a warrantless arrest in the absence of probable cause was clearly established at the time of the events in question. The inquiry is not quite that simple, however. Although a right may be clearly established in the abstract, the particular parameters of that right may not be. In other words, whether that right was violated under the particular circumstances present in the plaintiff's case may not have been so clearly established that the defendant should have known that he was violating the plaintiff's rights.

Thus, in *Rodriguez,* the Second Circuit, though stating that the right of an individual not to be subjected to excessive force was " 'clearly established' in the conventional sense," 66 F.3d at 476, held that at the time of the events at issue there, that right was *not* clearly established in the context of the actions which gave rise to the suit. *Id.* at 477.

Similarly, the court in *Hawkins v. Steingut,* 829 F.2d 317, 320–21 (2d Cir.1987), held that though certain Supreme Court decisions had clearly established a prohibition against "patronage" dismissals of certain public employees at the time that the plaintiff was denied reappointment as an administrative law judge, the law at that time was "far from 'clearly established' " with respect to whether the prohibition extended to the particular position held by the plaintiff. The court

therefore held that the defendants were entitled to qualified immunity as a matter of law on the plaintiff's First Amendment claim.

The same kind of situation can arise in the context of a false arrest claim. For example, in *Warlick v. Cross*, 969 F.2d 303 (7th Cir. 1992), the defendant police officer, while executing a search warrant of the plaintiff's residence, found on a dresser some hand-rolled cigarettes and white powder, which he claimed had tested positive for cocaine in a field test. He arrested the plaintiff for possession of marijuana and cocaine. Subsequent laboratory tests both came back negative; the powder was actually baking soda.

The plaintiff sued for false arrest, alleging that the defendant lacked probable cause to arrest her. The jury found for the plaintiff. On appeal, the Seventh Circuit observed that "[t]he requirement of probable cause for a lawful arrest was obviously established at the time of Warlick's arrest." *Id.* at 309. After reviewing state case law concerning probable cause for drug arrests, the court concluded that at time of the plaintiff's arrest, the law was *not* clearly established whether materials of the type found on the dresser would establish probable cause. The court therefore concluded that even assuming, as the jury found, that probable cause was lacking, "we cannot say that such a conclusion was the necessary result of clearly established law, thus Officer Cross is entitled to qualified immunity." *Id.* at 310.

■ In the case at bar, assuming *arguendo* that Kelley did not have probable cause to arrest plaintiff for perjury, the law was not clearly enough established at the time in question to make the unlawfulness of Kelley's actions apparent. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Rodriguez*, 66 F.3d at 476. Kelley is therefore entitled to summary judgment on the basis of qualified immunity regardless of whether he in fact had probable cause for plaintiff's arrest.

Both sides here have cited several cases that discuss the elements of perjury. The

problem, however, is that those cases deal with whether perjury had *actually occurred,* not with whether probable cause existed to *believe* that it had occurred. Neither side has cited, nor has the court found, a single case addressing the issue of probable cause to arrest for perjury under New York law.[3] Clearly then, it could hardly be said that the law was clearly established that the type of testimony presented at the hearing in this case would not support an arrest for perjury.

### III. Claims Against DiPasquale

Unlike Kelley's situation, it is less clear in what capacity DiPasquale was acting when he arrested and swore to the felony complaint against Dale. It is not disputed that during the hearing against J.R., DiPasquale was acting as a court officer. *See* Statement of Material Facts by DiPasquale and Village at 2. It is thus mere coincidence that he is also the Chief of the Mount Morris Police Department. However, in swearing to the complaint he may have been acting in his capacity as a police officer rather than as an officer of the court.

■ In any event, "[t]he extent of government officials' immunity depends upon the likely effect their exposure to liability will have on the operation of effective government in a particular context, balanced against the potential for a deprivation of individual rights in that context." *Valdez v. City and County of Denver*, 878 F.2d 1285, 1287 (10th Cir.1989).

■ With respect to the false arrest claim, I find it compelling that DiPasquale was acting at the direction of an Assistant District Attorney. While he is not *per se* qualifiedly immune from liability simply because the prosecutor, in essence, declared that probable cause existed, *see Malley v. Briggs*, 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098–99, 89 L.Ed.2d 271 (1986), I find that on these facts DiPasquale's actions were objectively reasonable. He is, therefore, entitled to qualified immunity.

---

**3.** That is not surprising, since perjury prosecutions are relatively uncommon. In addition, case law guidance on probable-cause issues is more likely to be found in areas of the law such as

drugs and weapons offenses, since probable cause is often an issue in motions to suppress physical evidence in such cases.

First, as a practical matter, police officers must be able to rely on the advice of prosecutors. The judicial system depends upon this reliance. I also note that DiPasquale discussed the incident with Livingston County District Attorney Thomas Moran before signing the felony complaint. At that time Moran directed him to sign the complaint. (Statement of Material Facts by Defendants, Charles J. DiPasquale and Village of Mount Morris at 2–3.) It is clear that DiPasquale's actions were motivated by the District Attorney's order and not on his own initiative.

I conclude, therefore, that DiPasquale's reliance on Kelley's relatively more expert opinion that probable cause existed was objectively reasonable as a matter of law. *See Arnsberg v. United States*, 757 F.2d 971, 982 (9th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). Therefore, DiPasquale is entitled to qualified immunity. *East Coast Novelty Co., Inc. v. City of New York*, 781 F.Supp. 999, 1011 (S.D.N.Y.1992).

■ I also find that DiPasquale is immune from liability on the malicious prosecution claim. This claim is based on DiPasquale's having sworn to a felony complaint against plaintiff for perjury. One of the elements of this claim, however, is a lack of probable cause for the criminal proceeding. *Broughton*, 37 N.Y.2d at 457, 373 N.Y.S.2d 87, 335 N.E.2d 310. For the reasons already stated, I find that probable cause did exist to commence the criminal proceeding, and that even if it did not, DiPasquale could not reasonably have known that. In fact, as a police chief rather than a district attorney, DiPasquale would have even less reason than Kelley to know whether probable cause was lacking.

## IV. Claims Against the County and the Village

Because I have found that there was probable cause to arrest plaintiff and to initiate criminal proceedings against her, her false arrest and malicious prosecution claims fail entirely. Thus, these claims must be dismissed against the County and the Village as well.

■ The claims against the County are deficient for additional reasons as well. A § 1983 lawsuit against a municipality must allege that the deprivation of the plaintiff's rights was effected pursuant to the existence of a custom or policy of the municipality. *Monell v. Department of Social Services*, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978).

■ Concerning the false arrest cause of action, there is no evidence to support a claim that the County had or endorsed a policy of making arrests for perjury. The District Attorney was the final policymaker within the District Attorney's Office and by the time he had been apprised of the situation, plaintiff had already been arrested. Plaintiff has presented no evidence that the District Attorney or any County officials knew of Kelley's actions prior to plaintiff's arrest. Therefore, even if acts of the District Attorney could be attributed to the County, which can occur in only limited situations, there is no activity here on the part of the District Attorney relating to plaintiff's arrest.

The activities of the District Attorney occurred, if at all, in connection with the malicious prosecution cause of action but, there are only limited circumstances in which actions of the District Attorney can impose liability on the County.

In the Second Circuit, § 1983 liability for the actions of a district attorney can attach to a county only in a limited range of circumstances. In *Baez v. Hennessy*, 853 F.2d 73 (2d Cir.1988), *cert. denied*, 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989), the court said that "[w]hen prosecuting a criminal matter, a district attorney in New York State ... represents the State not the county," *id.* at 77, and consequently ruled that "a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability." *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir.1992) (describing holding of *Baez*), *cert. denied*, ── U.S. ──, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993).

In *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir.1991), the court limited *Baez* somewhat by holding that a municipality could be held liable in a § 1983 malicious prosecution case if the district attorney had a

"long history of negligent disciplinary practices regarding law enforcement personnel, which gave rise to the individual defendants' conduct in promoting the malicious prosecution of plaintiffs." *Id.* at 152 n. 5.

Taken together, then, *Baez* and *Gentile* stand for the proposition that "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Walker,* 974 F.2d at 301. "Consequently, as long as a plaintiff's 'claims center[ ] not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office,' there can be liability against a New York county for an alleged malicious prosecution." *Pinaud,* 52 F.3d at 1153–54 n. 14. Thus, "an allegation of deficiencies in the 'management of the [district attorney's] office' would appear to be necessary ... in order for any claim of malicious prosecution against the County ... to stand." *Id.* at 1153.

This is not such a case. The actions alleged here related to whether to prosecute plaintiff on a perjury charge, not on any mismanagement in the administration of the District Attorney's Office. As such, there is no basis for liability against the County even if the District Attorney's action has been improper.

### CONCLUSION

Plaintiff's motion for summary judgment on the issue of liability against defendants Kelley and DiPasquale (Item 12) is denied.

Defendants' motions for summary judgment in favor of all defendants (Items 15 and 19) are granted in their entirety, and the complaint is dismissed.

IT IS SO ORDERED.