**Samuel R. DONOVAN, Plaintiff,**

v.

**Cara M. BRIGGS, et al., Defendants.**

**No. 01–CV–6207L.**

United States District Court,
W.D. New York.

Feb. 26, 2003.

Jeffrey Wicks, Jeffrey Wicks, PLLC, Rochester, NY, for Plaintiff.

Charles S. Turner, Monroe County Attorney's Office, Timothy M. Lexvold, Rochester, NY, for Defendants.

## DECISION AND ORDER

LARIMER, District Judge.

This case involves an action by a father who was arrested and charged with the rape of his teenage daughter based on what turned out to be a fabricated complaint by the daughter. Plaintiff sued the sheriff's deputy who arrested him and the Assistant District Attorney who authorized the arrest. Based on the clear vision afforded by hindsight, some might suggest that a different approach might have avoided charging plaintiff with this most serious crime. This Court, however, must *not* view this case from hindsight but from the vantage point of the defendants as the facts were known to them at the time. Using this as the standard, I believe that defendants are entitled to judgment in their favor and, therefore, plaintiff's complaint must be dismissed.

Plaintiff, Samuel R. Donovan, commenced this action under 42 U.S.C. § 1983 on April 26, 2001, asserting various claims arising out of his arrest in July 2000 and subsequent prosecution for rape, incest and endangering the welfare of a child. All of the charges against plaintiff were dismissed in April 2001.

Defendants are Cara M. Briggs ("Briggs") and Steven M. Peglow ("Peglow"), who at all relevant times were a Monroe County Assistant District Attorney and a Monroe County Sheriff's Deputy, respectively. Plaintiff asserts claims against Briggs for false arrest and false imprisonment, and against Peglow for false arrest, false imprisonment, and malicious prosecution. Both sides have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

On July 11, 2000, defendant Peglow was working in the Impact Unit of the Monroe County Sheriff's Department. The Impact Unit handled cases with victims under age sixteen. Transcript, Deposition of Steven

Peglow ("PDT"), Plaintiff's Cross–Motion for Summary Judgment (Docket # 29), Ex. G, at 7. On that date, Peglow was informed that a case had come in concerning plaintiff's then-sixteen-year-old daughter Monica Donovan ("Monica"), who had reported being raped by her father on the night of July 9 at plaintiff's home, where Monica had been living.

Shortly after being apprised of the nature of Monica's allegations, Peglow contacted Monica's mother, Veronique Cheney, who was plaintiff's ex-wife. From Cheney, Peglow learned that Monica had come to Cheney's home on July 10, and that she had not returned to plaintiff's home where she had been living. Peglow made an appointment to meet with Monica later that day at the Impact Unit offices.

Peglow did meet with Monica on July 11. She told him that "somewhere around . . . midnight [on the night of July 9] that her father had come into her room and had forced himself on her sexually, penetrated her, and then had left." PDT at 30. In response to Peglow's questions, Monica told him that she had told her father "no," but that he had used one of his hands to hold her hands down above her head as she was lying on the bed, and that he put his other hand over her mouth so that she could not cry out. PDT at 31. She stated that her father had penetrated her, but she did not believe that he had ejaculated. PDT at 34–35.

Monica told Peglow that when he was finished, her father left the room. She then got dressed and left the house, leaving a note with the word "rapist" on her pillow. She told Peglow that she had slept in a park that night, and that the next day, she called the New York State Child Abuse Hotline from a pay phone to report that she had been raped. She said that she then went to her mother's house.

During their conversation, Peglow asked Monica if she used drugs. Peglow testified at his deposition that Monica stated that she had used drugs previously, but that she had not used any "for so many weeks or a month or something." PDT at 27. Although Monica testified at her deposition that she had "probably" used marijuana on July 9 or 10, *see* Transcript, Deposition of Monica Donovan ("MDT"), Plaintiff's Cross–Motion, Ex. K, at 16, Peglow stated that there was nothing about Monica's appearance or behavior that led him to believe that she was under the influence of drugs or alcohol. PDT at 28.

At some point during his investigation of this matter, Peglow received and looked over medical documents from Rochester General Hospital, where Monica had gone to be examined on July 10. Peglow contacted Tammy Germonto, a Sexual Assault Nurse Examiner who had seen Monica, and who had signed the examination report. That report, under the heading "Objective Data," contained the following notations: "1 cm tear noted at Fossa navicularis [1] 5 o'clock & 6 o'clock; cervix red; labia majora minora red; dried secretions noted." Plaintiff's Cross–Motion, Ex. H. A diagram of a female genital area indicated a tear near the vagina, and stated, "Redened [sic]" and "Bleed" at the vaginal opening. *Id.* The report also stated that Monica said that she had not had consensual sexual intercourse within the preceding seventy-two hours.

Peglow stated at his deposition that he "asked [Germonto] about the medical doc-

---

1. The fossa navicularis is "a depression between the posterior margin of the vaginal opening and the fourchette," which is "a small fold of membrane connecting the labia minora in the posterior part of the vulva." MEDLINEplus Medical Dictionary, *http://www2.merriam-webster.com/cgi-bin/ mwmednlm.*

uments that [he] had; and basically what [he] was looking for from her was a time frame, if this could have been a longer-standing injury. And she gave [Peglow] the time frame in the report, which at that time fell with when Monica was alleging this incident to have occurred." PDT at 45.

During his conversation with Monica, Peglow had learned that she was scheduled to appear in Family Court the next day in connection with a petit larceny or similar charge that was pending against her as a result of an alleged shoplifting. He also learned that Monica's father often had attended her court appearances in the past.

Peglow went to Family Court on July 12. He saw Monica (without her father) prior to the proceeding and told her that he intended to talk with her father. At some point plaintiff appeared, with his attorney.[2] Peglow asked if he could speak with plaintiff, and Peglow, plaintiff, and plaintiff's attorney went to a small conference room.

Peglow and plaintiff talked about Monica and the events of the previous few days. Although neither plaintiff nor Peglow was able at his deposition to recall their conversation in much detail, plaintiff testified

that he told Peglow about "Monica's legal problems and drug problems," DDT at 56. Plaintiff also showed Peglow the "rapist" note that Monica had left on her bed, as well as a so-called "to-do list" that he had found in his home on July 6. This was a handwritten note, in what plaintiff recognized as Monica's handwriting, that stated:

> Destroy "M" Files
>
> cause dad's computer to crash
>
> Frame dad for Abuse (sexual or physical?)[3]

Plaintiff's Cross–Motion, Ex. L.

Plaintiff testified that near the end of this conversation, Peglow told him that Monica had made some allegations about plaintiff, but that Peglow did not say exactly what sort of allegations they were. Plaintiff claimed that Peglow told him, "from what I hear I don't think you have anything to worry about." DDT at 58–59. At his deposition, Peglow did not specifically recall telling plaintiff not to worry, but he stated that as a matter of course, he would have said, "As long as you tell me the truth, you have nothing to worry about, everything will be okay," or words to that effect. PDT at 57. With plaintiff's permission, Peglow took the "to-do list" with him.[4]

---

**2.** By this time, plaintiff (who had spoken to his ex-wife) had some idea that Monica had been making some allegations against him, though he apparently was not sure of the precise nature of those allegations. He stated in his deposition that he asked his attorney to accompany him that day because he "was afraid that [he] was being framed by [his] ex-wife and her husband" and that "it seemed prudent for [him] to have legal representation." Transcript, Deposition of Samuel R. Donovan ("DDT"), Plaintiff's Cross–Motion, Ex. M, at 52–53.

**3.** There were also two small interlineations stating "1st: printer" and "2nd: modem," followed by the word "then:," with an arrow

pointing to the line about causing the computer to crash.

**4.** In addition, plaintiff consented to having investigators come to his house and take the bedding from Monica's room. Peglow stated at his deposition that he recalled that the only evidence found on the bedsheets was a "spot of blood ... on the corner of one of the sheets," but that technicians at the Monroe County Crime Lab were unable to identify the source of the blood. PDT at 98. An investigative action report signed by Peglow on July 20, 2000, refers to a "technician's report for details" regarding the sheets, Plaintiff's Cross–Motion, Ex. J, but the report does not appear in the record, and it is not clear whether either defendant was aware of the

Following this meeting, Peglow spoke to defendant Briggs. He testified that part of the reason that he wanted to speak to her about the case was the "to-do list," which he said "put some doubt [in his mind] maybe in what was going on . . . ." PDT at 61, 64. He gave her a synopsis of what he had learned so far about Monica's allegations. Briggs recommended to Peglow that he confront Monica with the "to-do list," and to ask her if she could explain it. PDT at 64; Transcript, Deposition of Cara M. Briggs ("BDT"), Plaintiff's Cross–Motion, Ex. F, at 33.

Peglow met with Monica again on July 18 at the Impact Unit offices. A Child Protective Services worker, Janet Ewing, was also present. Peglow testified that when shown the "to-do list," Monica "admitted that she had written the ['to-do list'], that she had written it weeks prior," at a time when "[s]he was upset with" her father. PDT at 66, 67. She acknowledged that her father had confronted her with the list when he found it, several days before the alleged rape. PDT at 67–68. She also began to cry, stating that she was afraid that because of the note, "she would not be believed" about the rape. PDT at 67.[5]

Peglow testified that in his view, the "to-do list" and Monica's reaction to it in some ways added credence to her allegation of rape. He stated that "[i]t didn't make sense" to him that Monica "would go through making up a story" that she had been raped, knowing that her father had the list in his possession, which he could use to discredit her allegations. Peglow stated that plaintiff might have "felt that he could basically rape [Monica] at that point and then say, 'What do you mean? She's framing me. She said she was going

to frame me,' and produce this note." PDT at 70. Knowing this, Peglow reasoned, Monica would have been less likely to make a false accusation of rape against her father.

According to Peglow, Monica also told him

how her father would watch her sunbathing when she was out on the back deck in her bikini; how he would sit in the kitchen and watch her; how when she would be sitting on the couch, he would come and sit right next to her when there were plenty of other places to sit. And those descriptions came across to us as what they call a courting sometimes and even in sexual abuse cases where a suspect gains a liking for the victim through those kinds of things.

PDT at 71. At her deposition, Monica also testified about telling Peglow and Ewing that her father had "made [her] feel uncomfortable" in these ways. *See* MDT at 34–35.

Peglow testified that following this meeting with Monica, he again contacted Briggs. He told her that "it was the Sheriff's Office opinion that we should just send this over for a Grand Jury indictment." PDT at 72. Peglow stated that because the evidence was not conclusive, he thought it would be advisable to seek "a little bit of an impartial decision" from a grand jury.

Briggs, however, disagreed and recommended that plaintiff be arrested. Peglow testified that Briggs "stated that with physical evidence and a signed Supporting Deposition and [Monica's] demeanor and things that probable cause existed and that we would be able to make an arrest."

---

results of the lab tests at the time of plaintiff's arrest.

**5.** Monica testified that she could not remember much of what she said to Peglow about the note. *See* MDT at 81–82.

PDT at 72. He said that Briggs "stated to arrest Sam [Donovan] and have him arraigned with $2500 cash or bond bail." PDT at 73. According to Peglow, Briggs "stated . . . that probable cause existed and that there was no reason to go for a sealed indictment and that an arrest was appropriate." PDT at 74–75. Peglow testified that after discussing the matter with Briggs, he "felt that the probable cause was there." PDT at 76. He said that he had also talked to Janet Ewing about the second interview with Monica, and that she also "felt that [Monica] acted appropriately and that she was telling the truth." PDT at 76.

In her deposition testimony concerning this conversation, Briggs stated that Peglow related to her the substance of his meeting with Monica, and that at some point he asked her for her opinion as to whether there was probable cause to arrest plaintiff. She testified that she "told him it was [her] opinion that there was [probable cause], based on the totality and all the evidence that he had described to" Briggs. BDT at 101. She recalled telling Briggs, "Yeah, there's probable cause. Go ahead," or words to that effect. BDT at 103.

Monica had another Family Court appearance scheduled for the next day, July 19. Peglow, expecting plaintiff to be in attendance, went there when Monica was scheduled to appear. Plaintiff did attend, and at some point, Peglow approached him and told plaintiff that he was under arrest.

Plaintiff testified that he did not know initially what he was being arrested for, but that he was "sure" that it was related to Monica. DDT at 68. Plaintiff testified that he "was screaming at [Peglow], 'You know you're making a horrible mistake.'" DDT at 68. According to plaintiff, Peglow responded, "I've been instructed to make

an arrest," though he did not say by whom. DDT at 68.

Someone who had accompanied plaintiff called his attorney, who arrived a short time later. He spoke with Peglow, who recalled telling the attorney that "we talked to the DA's Office and that they said that we can go through with this, that probable cause existed . . . ." PDT at 81–82.

Plaintiff was then taken to the Monroe County Sheriff's Office for processing. From there, he was taken to Pittsford Town Court to be arraigned. With Briggs's consent, plaintiff was ordered released on his own recognizance. He was then driven back to the Sheriff's Office, where he was fingerprinted and released. He testified that the period from the time of his arrest until his return home lasted about four hours. DDT at 78.

Plaintiff was charged with Rape in the First Degree, Rape in the Third Degree, Incest, and Endangering the Welfare of a Child. The charges were based on a supporting deposition signed by Monica on July 11, 2000, and a felony complaint signed by Peglow on July 19, 2000. *See* Plaintiff's Cross–Motion, Ex. E. Prosecution of the case was assigned to Marcie Seaburg, Esq., another Assistant District Attorney. There is no evidence that Briggs or Peglow had any involvement in the case after July 19, 2000, the day of plaintiff's arrest.

In September 2000, Monica entered an inpatient substance abuse treatment program at Park Ridge Hospital. About two or three weeks after entering the program, she admitted to her counselor that she had fabricated the entire story about being raped by her father. Eventually her recantation was made known to others, including plaintiff's attorney and the District Attorney's office.

In a letter dated January 20, 2001, plaintiff was informed by the New York State Office of Children and Family Services that following an investigation by the local child protective service, "no credible evidence was found to believe that [Monica] ha[d] been abused or maltreated. Therefore, the report [of the alleged rape] has been determined 'unfounded.'" Plaintiff's Cross–Motion, Ex. O.

On March 23, 2001, plaintiff moved to dismiss the charges against him pursuant to N.Y. C.P.L. § 30.30. On March 27, the District Attorney presented plaintiff's charges to a grand jury specifically for the purpose of obtaining a "no bill." On March 30, the Monroe County Court granted plaintiff's motion to dismiss, and on April 12, 2001, the grand jury returned a no bill.

## DISCUSSION

### I. General Principles

Summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). Where both sides have moved for summary judgment, each party's motion must be evaluated on its own merits, and all reasonable inferences must be drawn against the party whose motion is under consideration. *Schwabenbauer v. Board of Educ. of Olean,* 667 F.2d 305, 314 (2d Cir.1981).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim

for false arrest under New York law." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). In addition, "[i]n order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (citation omitted). Therefore, there are any material issues of fact in this case must be determined with reference to the law in New York relating to false arrest[6] and malicious prosecution.

■■■ To establish a claim for false arrest, plaintiff must show that: (1) the defendants confined him; (2) he was conscious of the confinement; (3) he did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). The elements of a malicious prosecution claim are: (1) the commencement or continuation of a criminal proceeding by the defendants against the plaintiff; (2) the termination of the proceeding in favor of the accused; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice. *Id.* at 457, 373 N.Y.S.2d 87, 335 N.E.2d 310. In addition, a "plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must ... show some deprivation of liberty consistent with the concept of 'seizure,'" in order "to ensure that the § 1983 plaintiff has suffered a harm of constitutional proportions." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *accord*

---

**6.** Although the complaint alleges both false arrest and false imprisonment, the two terms are virtually synonymous under New York law. *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991).

*Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003).

The material facts here are not in dispute. The parties agree that there is no dispute about what facts were known to defendants at the time of plaintiff's arrest. The questions presented on these motions are legal ones, specifically whether the known facts and inferences from them gave rise to probable cause to arrest plaintiff, and whether defendants are entitled to immunity for their actions. *See Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (where facts are not in dispute, whether officer should have known that he acted unlawfully is a question of law better left for the court to decide); *Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994) (where facts are undisputed, qualified immunity may be decided by the court as a matter of law), *cert. denied,* 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995).

## II. Plaintiff's Official–Capacity Claims

■ The complaint states that both defendants are sued in their official as well as their individual capacities. Defendants have moved for summary judgment on the official-capacity claims on the ground that there is no allegation or evidence that either defendant was acting pursuant to an official custom or policy. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's 'policy or custom' must have played a part in the violation of federal law' ") (quoting *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

Plaintiff has not responded to this part of defendants' motion, and I agree with defendants that plaintiff has demonstrated no basis for any claims against Briggs and Peglow in their official capacities. Accordingly, defendants are entitled to summary judgment on the claims brought against them in their official capacities.[7]

## III. False Arrest Claims

### A. Probable Cause to Arrest

■ As stated, one of the elements of a false arrest claim-and the only one in dispute here-is whether the arrest was otherwise privileged. An arrest made upon probable cause is privileged. *See Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003) ("If probable cause existed, Tavernier as a police officer would be privileged to make an arrest"). Thus, "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Singer,* 63 F.3d at 118.

Probable cause exists when the authorities "have knowledge or reasonably trustworthy information of facts and circum-

---

7. Although neither party has raised this issue, there is authority suggesting that the official-capacity claims, at least against Briggs, might also be barred by the Eleventh Amendment. *See McKeon v. Daley,* 101 F.Supp.2d 79, 86 (N.D.N.Y.2000) ("when a district attorney is sued for damages in his official capacity, the suit is deemed to be a suit against the state, and the district attorney is entitled to invoke the Eleventh Amendment immunity belonging to the state") (citing *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)), *aff'd,* 8 Fed.Appx. 138 (2d Cir.2001); *see also*

*Pinaud v. County of Suffolk,* 52 F.3d 1139, 1154 n. 15 (2d Cir.1995) (stating that there can be no county liability under § 1983 for malicious prosecution unless claim is based on allegations of deficiencies in the *management* of the district attorney's office, rather than on the district attorney's decisions about whether, and on what charges, to prosecute). Since plaintiff does not appear to oppose this aspect of defendants' motion, however, and because there is no evidence that *defendants* acted pursuant to an official policy or custom in any event, I need not reach that issue.

stances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Jenkins*, 876 F.2d 1085, 1089 (2d Cir.1989) (citations and internal quotation marks omitted); *see Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense'") (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (alteration in original)).

Although an arrest cannot be based on a mere hunch, *United States v. Patrick*, 899 F.2d 169, 174 (2d Cir.1990), "a probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego*, 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd*, 52 F.3d 310 (2d Cir. 1995). "In fact, the eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Id.* (citing *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

■ "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miloslavsky v. AES Eng'g Soc'y*, 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd*, 993 F.2d 1534 (2d Cir.1993)). "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circum-

stances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119. *See also State v. Amarillo*, 198 Conn. 285, 310, 503 A.2d 146 (1986) ("It is generally agreed … that a comparable showing [of reliability] is not needed to establish veracity when the information comes from an average citizen who is in a position to supply information by virtue of having been a crime victim") (citation and internal quotation marks omitted; alterations in original) (quoted in *Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir.1997)).

■ Applying these principles to the undisputed facts before me, I find that Peglow did have probable cause to arrest plaintiff on July 19. Defendants are therefore entitled to summary judgment.

First, and most important, defendants had the statements of the putative victim herself, which is typically sufficient to establish probable cause. *Martinez*, 202 F.3d at 634. Although the "to-do list" cast at least some initial doubt on Monica's credibility, there was also much to suggest that her allegations were credible. Monica had reported the alleged rape within twenty-four hours after it occurred. She described the rape in some detail, as well as certain behavior of her father prior to the rape which Peglow believed, based on his experience, consistent with "courting" behavior sometimes found in sexual abuse cases. Monica appeared calm and rational; a Child Protective Services worker found her behavior to be consistent with a rape victim's, and her story to be credible. A physical examination of Monica revealed a small tear, and evidence of bleeding, in her genital area, consistent with the time frame of her story. Monica also signed a sworn deposition relating her allegations.

Both New York State and federal courts have held that a purported crime victim's identification of the alleged culprit will generally suffice to create probable cause

to arrest. *See, e.g., Minott v. City of New York,* 203 A.D.2d 265, 267, 609 N.Y.S.2d 334 (2d Dep't) ("information provided by an identified citizen accusing another individual of the commission of a specific crime is sufficient to provide the police with probable cause to arrest"), *leave to appeal dismissed,* 83 N.Y.2d 1000, 616 N.Y.S.2d 480, 640 N.E.2d 148 (1994); *People v. Crespo,* 70 A.D.2d 661, 417 N.Y.S.2d 19 (2d Dep't 1979) ("Unlike a paid or anonymous informant, an eyewitness victim of a crime can provide probable cause for the arrest of his assailant despite the fact that his reliability has not been previously established or his information corroborated. The victim's reliability is assured because he can be prosecuted if his report is a fabrication") (citation omitted); *Crockett v. Cumberland College,* 316 F.3d 571, 584 (6th Cir.2003) ("it is clearly established that reliance on the account of an eyewitness is sufficient to established probable cause"); *Torchinsky v. Siwinski,* 942 F.2d 257, 262 (4th Cir.1991) (affirming district court's ruling that defendants were entitled to qualified immunity with respect to plaintiff's section 1983 claim for arrest without probable cause and stating that "[i]ndeed, it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim"); *Smith v. City of Chicago,* 913 F.2d 469, 473 (7th Cir.1990) ("The combination of the victim's photo identification of Smith, her sworn complaint and her statement to the judge that Smith raped her certainly provide the probable cause necessary to justify Smith's arrest"), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 994 (1991). *See also Orminski v. Village of Lake Placid,* 268 A.D.2d 780, 781, 702 N.Y.S.2d 181 (3d Dep't 2000) ("Here, the complainant reported the alleged crime within hours of its occurrence, endured a rape kit examination at the local hospital and presented herself in such a way that [police detective] believed her accusations to be true"; detective therefore had probable cause to arrest alleged culprit) (citation omitted).

I recognize that whether probable cause exists under such circumstances may depend in part on whether "materially impeaching circumstances" are present. *People v. Walker,* 129 A.D.2d 751, 514 N.Y.S.2d 512 (2d Dep't 1987); *accord United States v. Anderson,* 533 F.2d 1210, 1213 (D.C.Cir.1976); *see also Singer,* 63 F.3d at 119 ("[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity"); *Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir.1999) (eyewitness identification will constitute sufficient probable cause "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation") (internal quote omitted).

In the case at bar, there were circumstances that could have called Monica's credibility into question: first and foremost, the "to-do list," and also her admitted past drug and alcohol use. Viewed in the context of all the other facts and "reasonably trustworthy information" that were known by defendants at the time, however, *Jenkins,* 876 F.2d at 1089, these factors were not enough to dispel probable cause in this case. For one thing, although Monica admitted having used drugs and alcohol in the past, she claimed, and appeared, to be sober at the times that she spoke with Peglow. When confronted with the list, Monica admitted having writ-

ten it a few weeks earlier, and admitted that her father had also confronted her with it prior to the alleged rape, but she steadfastly maintained her story. In addition, Janet Ewing, a Child Protective Services worker who presumably had some expertise in dealing with such matters, told Peglow that she believed that Monica was telling the truth. Taken together, I believe that these facts were sufficient "to warrant a person of reasonable caution in the belief" that an offense had been committed by plaintiff. *Id. See Orminski,* 268 A.D.2d at 782, 702 N.Y.S.2d 181 (fact that police officer was faced with conflicting statements from putative victim, alleged perpetrator, and witnesses about alleged rape did not mean that officer lacked probable cause to arrest; noting that "the scenario with which [the officer] was presented was certainly not atypical, particularly where the offense alleged to have been committed was a sexual assault to which there are usually no witnesses"; *Clay v. Conlee,* 815 F.2d 1164, 1168 (8th Cir.1987) (even where victim of rape was intoxicated and appeared "fuzzy-headed" when she first arrived at the hospital, arrest of defendant was supported by probable cause when victim was not "incoherent, irrational, confused, or intoxicated" when she spoke to police officers)).

▆ Plaintiff asserts that, primarily because of the existence of the "to-do list," Peglow should have investigated Monica's claims further, and that had he done so, he would have discovered that her allegations were not credible, and that probable cause did not exist. Once probable cause exists, however, a "police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997); *see also Crockett,* 316 F.3d at 581 ("Once an officer establishes probable cause, he or she is under no obligation to continue investigating and may instead pursue the arrest of a suspect"); *Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir.1999) ("Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused"); *Dirienzo v. United States,* 690 F.Supp. 1149, 1157 (D.Conn. 1988) (where facts available to officers demonstrate probable cause for arrest, officers have no "affirmative duty to exhaust all possible avenues of investigation").

It also bears repeating that the standard for establishing probable cause is not a particularly stringent one. It does not require proof of a suspect's guilt beyond a reasonable doubt, *United States v. Manley,* 632 F.2d 978, 984 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *Hahn,* 820 F.Supp. at 55. Instead, probable cause to arrest exists when the known facts are "sufficient to warrant a person of reasonable caution in the *belief* that the person to be arrested has committed or is committing a crime." *Jocks,* 316 F.3d at 135 (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (emphasis added)). *See Loria v. Gorman,* 306 F.3d 1271, 1288–89 (2d Cir.2002) ("probable cause is an assessment of probabilities, not an assessment of truths").

Based on the objective facts known to Briggs and Peglow at the time, I find that this standard was met here, and that there was sufficient information to give rise to probable cause. The level of proof required is not certainty, nor is it proof beyond a reasonable doubt. The evidence certainly was enough to establish a probability of criminal activity. That is enough for probable cause.

**B. Qualified Immunity**

Because I have determined that probable cause for plaintiff's arrest existed, I

need not reach the issue of qualified immunity, *see Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity"). Nevertheless, I find that even if probable cause was lacking or questionable, defendants are entitled to qualified immunity from suit.

█ Qualified immunity shields public officials "from civil damages liability insofar as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), or insofar as 'it [is] objectively reasonable for them to believe that their acts d[o] not violate those rights,' *Velardi v. Walsh,* 40 F.3d 569, 573 (2d Cir.1994)." *Simms v. Village of Albion,* 115 F.3d 1098, 1106 (2d Cir.1997); *accord Brown v. City of Oneonta,* 106 F.3d 1125, 1130–31 (2d Cir.1997), *abrogated on other grounds by Gonzaga Univ. v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Under this doctrine, then, "a government official may claim immunity from suit ... when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful." *Hill v. City of New York,* 45 F.3d 653, 661 (2d Cir. 1995). In determining whether an official is entitled to qualified immunity, the focus is on "objective circumstances rather than an officer's subjective motivation." *Bradway v. Gonzales,* 26 F.3d 313, 319 (2d Cir.1994) (citation omitted).

"The Supreme Court has stated that the immunity accorded officials by this doctrine protects 'all but the plainly incompetent or those who knowingly violate the law,' and added that 'if officers of reasonable competence could disagree on [the legality of an act], immunity should be recognized.'" *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). The Court has also made clear that "[t]he entitlement is an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

█ With respect to false arrest claims, the Second Circuit

> ha[s] stated ... that "[a]n arresting officer is entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."

*Lee,* 136 F.3d at 102 (quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). A police officer is therefore entitled to qualified immunity from suit if he "reasonably but mistakenly conclude[s] that probable cause is present." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1995). "Thus, a police officer who makes a warrantless arrest is entitled to summary judgment on the ground of qualified immunity only 'if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." *Rogers v. City of Amsterdam,* 303 F.3d 155, 158–59 (2d Cir.2002) (quoting *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001)).

█ Prosecutors are also entitled to immunity for many of the actions that they take in the scope of their employment, but

the nature of that immunity depends upon the nature of the function that they are performing at the time. It is clear, for example, that prosecutors acting within the scope of the adversarial function enjoy absolute immunity from suit. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 272–73, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Zahrey v. Coffey,* 221 F.3d 342, 346–47 (2d Cir. 2000). The Supreme Court has also held that prosecutors enjoy qualified, rather than absolute, immunity when they advise the police about legal matters, such as the existence of probable cause. *Burns v. Reed,* 500 U.S. 478, 492–96, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). *See Day v. Morgenthau,* 909 F.2d 75, 76, 78 (2d Cir.1990) (assistant district attorney who "directed" court officer to arrest plaintiff would have qualified immunity on claim of false arrest if "it was objectively reasonable for [him] to believe that probable cause existed for the arrest").

■ Where, as here, the relevant facts are undisputed, the issue of qualified immunity is generally appropriate for resolution through summary judgment. "Since qualified immunity is intended to protect government officials from the harassing and expensive burdens of litigation as well as the threat of monetary damages, courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by qualified immunity." *Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir.1995); *see also Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992) ("The Supreme Court has expressly encouraged the use of summary judgment when qualified immunity is raised as a defense") (citing *Har-*

*low,* 457 U.S. at 815–16, 102 S.Ct. 2727). In addition, the Supreme Court has stated that issues involving the defense of qualified immunity should ordinarily be decided "at the earliest possible stage in litigation." *Hunter,* 502 U.S. at 227, 112 S.Ct. 534. *See also Lennon,* 66 F.3d at 421 (when "the factual record is not in serious dispute ...[,][t]he ultimate legal determination whether ... a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide") (internal citations omitted); *Castro,* 34 F.3d at 112 (defense of qualified immunity "often can and should be decided on a motion for summary judgment").

■ Admittedly, one could make at least colorable arguments here either that there was, or was not, probable cause to arrest plaintiff. It is precisely for that reason, however, that defendants are protected by qualified immunity. The Second Circuit has stated that a "defendant is ... entitled to summary judgment on qualified immunity grounds ... if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that 'officers of reasonable competence could disagree' on the legality of the defendant[s'] actions." *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001) (quoting *Lennon,* 66 F.3d at 420) (internal quotes omitted); *accord Rogers,* 303 F.3d at 158. To put it another way, "if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate." *Lennon,* 66 F.3d at 421. Viewed objectively, the facts known to defendants at the time certainly meet that standard.[8]

---

**8.** Although many of the cases talk about whether reasonable "officers" could disagree, this test is not limited in its application only

to police officers. "The relevant inquiry focuses on whether a reasonable *official in the defendant's position* would have believed his

The constitutional right at issue, *i.e.*, the right not to be subjected to a warrantless arrest in the absence of probable cause, was clearly established at the time of plaintiff's arrest. *See Kent v. Katz*, 312 F.3d 568, 573 (2d Cir.2002) ("the principle that a warrantless arrest without probable cause violates the Fourth Amendment was clearly established prior to Katz's arrest of Kent in 1996"). As this Court stated in a similar case, however,

> [t]he inquiry is not quite that simple .... Although a right may be clearly established in the abstract, the particular parameters of that right may not be. In other words, whether that right was violated under the particular circumstances present in the plaintiff's case may not have been so clearly established that the defendant should have known that he was violating the plaintiff's rights.

*Dale v. Kelley*, 908 F.Supp. 125, 136 (W.D.N.Y.1995), *aff'd for reasons stated in district court decision*, 95 F.3d 2 (2d Cir. 1996); *see also Cartier*, 955 F.2d at 844 ("even where the law and the scope of permissible official conduct are clearly established, the defense of qualified immunity will protect a government official if it was 'objectively reasonable' for him to believe his acts were lawful"). *See, e.g., Rodriguez*, 66 F.3d at 476–77 (though the right of an individual not to be subjected to excessive force was "'clearly established' in the conventional sense," at the time of the events at issue there, that right was

*not* clearly established in the context of the actions giving rise to the suit); *Warlick v. Cross*, 969 F.2d 303, 309–10 (7th Cir.1992) (although "[t]he requirement of probable cause for a lawful arrest was obviously established at the time of Warlick's arrest," the law at that time was *not* clearly established whether probable cause would exist in circumstances confronting defendant police officer).

 The facts known to Briggs and Peglow at the time have been recited above, and need not be repeated in detail here. As that recitation makes clear, however, defendants had before them enough information-including the putative victim's sworn statement, her demeanor and her other statements which both Peglow and Ewing found consistent with a rape victim's, as well as physical evidence-upon which they could reasonably have concluded that Monica was telling the truth. That is enough to confer qualified immunity upon defendants for their actions. *See McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir.1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded") (quoted in *Lee*, 136 F.3d at 103); *see also Harrison v. Abraham*, No. Civ. A. 96–4262, 1997 WL 256970, *13–14 (E.D.Pa. May 16, 1997) (officers who arrested plain-

---

conduct was lawful given the state of law as it existed when the defendant took his challenged action." *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir.1999) (emphasis added). *See also Danahy v. Buscaglia*, 134 F.3d 1185, 1190 (2d Cir.1998) ("a government official's actions will be considered objectively reasonable if 'officers of reasonable competence could disagree' on the legality of defendant's actions") (considering qualified immunity of state attorney general, his former Acting Dep-

uty, and former Deputy for Administration) (quoting *Malley*, 475 U.S. at 341, 106 S.Ct. 1092).

While the Court must therefore consider any circumstances peculiar to either Briggs or Peglow in making these assessments, then, the test is simply whether a reasonable attorney, or a reasonable police officer, in the relevant defendant's position, would have believed that probable cause existed.

tiff for rape were entitled to qualified immunity; noting, *inter alia*, that: alleged victim knew plaintiff, identified him as assailant, and described alleged assault in detail; officer observed injuries on alleged victim consistent with her description of assault; and despite victim's and corroborating witnesses' admissions that some of them had been drinking beer or smoking crack cocaine earlier that night, "none of them were high or drunk at the time they gave their statements" to officer).

As stated, I am also aware that the existence of the "to-do list" could have given rise to some doubt about Monica's credibility. Indeed, both Peglow and Briggs did have concerns about the list, and for that reason, Peglow confronted Monica with the list and asked her point-blank if she could explain it. She did so, and, though she frankly admitted that the list might cause her to be disbelieved, Monica did not back down from her allegations. This put defendants in the unenviable position of not knowing whether-if they discredited her because of the list-they would be allowing Monica's father to use the list as a free pass to commit rape.[9]

More to the point, however, the case law instructs that circumstances calling a witness's or victim's truthfulness into question are relevant to the issue of probable cause, which is a separate issue from that of qualified immunity. *Warren v. Dwyer*, 906 F.2d 70, 75 (2d Cir.) ("the question of immunity remains, as it should, distinct from the question of probable cause") (citation omitted), *cert. denied*, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990); *Dale*, 908 F.Supp. at 136. In *Lee*, 136 F.3d 94, which was a false arrest case brought against three state troopers, the district court, relying on the statement in *Singer* that an "officer advised of a crime

by a person who claims to be the victim ... has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity," concluded that an officer who relies on a complainant whose veracity may be challenged lacks qualified immunity for an arrest until a jury decides the witness was in fact credible. The district court found that there was an issue of fact concerning the victim's veracity in that case, and denied the defendants' motion for summary judgment on the ground of qualified immunity.

On appeal, the Second Circuit vacated the judgment of the district court, and remanded with instructions to grant summary judgment for the troopers. In reaching that result, the Court of Appeals stated that

> *Singer* does not support [the district court's] result. The issue in *Singer* was whether the plaintiff stated a claim for false arrest under section 1983; the police defendant demonstrated that no claim was stated because he had probable cause for the arrest as a matter of law. *Singer* thus was not a qualified immunity case and did not employ the distinct analysis that applies in the immunity context.

*Lee*, 136 F.3d at 103 n. 6.

In addition, the defendants in *Lee* stipulated, for purposes of the appeal, that the victim was *not* a credible informant and that they consequently did not have actual probable cause to arrest plaintiff. Nonetheless, the Second Circuit held that "while the State Troopers, as stipulated, did not in fact have actual probable cause to arrest the plaintiff, they certainly had 'arguable' probable cause, and accordingly, it was objectively reasonable for the State Troop-

---

**9.** I also recognize that, as plaintiff points out, defendants were aware that plaintiff had no criminal record. While that is a relevant consideration, it is certainly not dispositive.

ers to believe that probable cause existed." *Id.* at 103.

In particular, the court noted that although "Mrs. Lee's [the victim] demeanor [initially] suggested she might either be intoxicated or dissociating," when the troopers "receiv[ed] confirmation from [a psychiatrist] that Mrs. Lee was not dissociating and could accurately relate facts about her alleged assault, . . . the State Troopers' initial doubts about Mrs. Lee's mental state were dispelled. At that point it was not unreasonable for the State Troopers to believe there was probable cause to arrest the plaintiff." *Id.* at 104 (citing *Clay v. Conlee,* 815 F.2d 1164, 1168 (8th Cir.1987) (even where victim of rape was intoxicated and appeared "fuzzy-headed" when she first arrived at the hospital, arrest of defendant was supported by probable cause when victim was not "incoherent, irrational, confused, or intoxicated" when she spoke to police officers)).

Similarly, in the case at bar, despite some initial misgivings about Monica's allegations, Peglow was able sufficiently to dispel those doubts for him to conclude, reasonably, that probable cause existed to arrest plaintiff. That reasonable belief entitles him to qualified immunity for his actions.

In addition, Peglow was entitled to rely, at least in part, on Briggs's opinion that probable cause existed. "[A]s a practical matter, police officers must be able to rely on the advice of prosecutors. The judicial system depends upon this reliance." *Dale,*

908 F.Supp. at 138 (concluding that village police chief's reliance on district attorney's "relatively more expert opinion that probable cause existed was objectively reasonable as a matter of law"); *see also Williams v. Fedor,* 69 F.Supp.2d 649, 677–78 (M.D.Pa.1999) (under objective-reasonableness standard, officers could rely upon district attorney's advice and believe that they were not violating plaintiff's rights by proceeding with perjury prosecution); *East Coast Novelty Co. v. City of New York,* 781 F.Supp. 999, 1011 (S.D.N.Y. 1992) (because she was entitled to rely on advice of counsel in drafting and executing warrant and she did not exceed that advice, officer was entitled to qualified immunity). Briggs was also reasonably able to reach that same conclusion based on her knowledge of the facts as relayed to her by Peglow, including his assessment of Monica's demeanor and credibility.[10] *See Costello v. Norton,* No. 96–CV–1634, 1998 WL 743710 (N.D.N.Y. Oct. 21, 1998) ("The objective reasonableness of [the assistant district attorney's] actions in advising the police depends upon the information available to him at the time") (citing *Hill,* 45 F.3d at 663).

It must be stressed that this does *not* mean that defendants necessarily could or should have concluded, beyond a reasonable doubt, that plaintiff had definitely raped Monica. Although an officer confronted with a purported crime victim's accusations must make some credibility judgments in deciding whether he has

---

10. While it may at first blush seem troubling to allow each defendant to rely on the other's opinions or advice in order to justify his or her own actions or decisions, there are limits to the extent to which they may do so. For example, Peglow could not reasonably have relied on Briggs's advice if he knew that she had formed her opinions based on inaccurate or misleading information. *Cf. United States v. Reilly,* 76 F.3d 1271, 1280 (2d Cir.1996) (police officers cannot claim good-faith reliance on search warrant if they deliberately omitted material facts in warrant application). Within those limitations, however, it is not only permissible, but necessary, to consider what each defendant had been told by the other, since the focus in deciding whether qualified immunity exists is on the information that each official possesses. *Hill,* 45 F.3d at 661.

probable cause to arrest the alleged culprit, he is not called upon to function as a jury, and determine the ultimate issue of guilt or innocence. In order to justify a warrantless arrest, an officer needs only to have probable cause, which is a much less stringent standard than the reasonable-doubt standard applied to criminal convictions. A "mere probability of criminal activity" will suffice. *Patrick*, 899 F.2d at 174; *see also United States v. Strickland*, 144 F.3d 412, 415 (6th Cir.1998) ("the Fourth Amendment does not require that a police officer *know* a crime occurred at the time the officer arrests or searches a suspect"). And to show a reasonable *belief* that probable cause existed, the officer need only show "arguable probable cause." *Caldarola*, 298 F.3d at 162; *Martinez*, 202 F.3d at 634. To be immune from suit, then, a defendant need only show that there was *arguably* a *probability* that the arrestee had committed a crime. *See Gisondi v. Town of Harrison*, 72 N.Y.2d 280, 285, 532 N.Y.S.2d 234, 528 N.E.2d 157 (1988) ("[i]n any investigation the police are likely to encounter discrepancies .... These matters may impair their ability to prove guilt beyond a reasonable doubt at trial, but they generally have little bearing at preliminary stages where the only relevant concern is whether there is sufficient evidence to show probable cause to believe the defendant committed the crime"); *Orminski*, 268 A.D.2d at 782, 702 N.Y.S.2d 181 ("Police officers are routinely called upon to investigate allegations of criminal conduct and, in the face of conflicting versions of events, make determinations whether probable cause exists to believe that crimes have been committed. Thus, the scenario with which [the detective] was presented was certainly not atypical, particularly where the offense alleged to have been committed was a sexual assault to which there are usually no witnesses").

As noted above, the Second Circuit in *Lee*, 136 F.3d 94, held that the defendant state troopers' actions in arresting the plaintiff were objectively reasonable as a matter of law, notwithstanding the admitted problems with the accusing witness's credibility. The court stated that it reached that conclusion after considering "the extraordinarily difficult judgment decisions that law enforcement officers must make in domestic violence situations, and the presence of factors here that suggest that [the purported victim's] statements were not incredible ...." *Id.* at 104 (citing *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed" after the fact)).

Those same considerations apply with equal force in the case at bar, and they compel the same result. A police officer, or prosecutor, investigating an alleged rape, particularly where the victim is a minor who claims to have been raped by her own father, must indeed make some "extraordinarily difficult" decisions. Eyewitness testimony-other than the victim's-will rarely be available. Concrete physical evidence may also be scarce, but even the complete absence of such evidence should not lightly be taken to mean that the accuser is lying. In short, the existence of probable cause in such cases will frequently depend upon little more than the statements of the purported victim herself.

When that happens, the officials involved should be able to make a decision, based upon their best judgment in light of the facts known to them at the time, without the threat of a lawsuit hanging over their heads if, despite their reasonable belief that probable cause existed at

that time, subsequent events prove the suspect's innocence. This is particularly true in the area of sex offenses, where law enforcement officials are frequently called upon to walk a tightrope between taking an accusing witness's allegations at face value, which runs the risk of violating the rights of the accused, and being overly skeptical of rape claims, and thereby chilling the willingness of victims to come forward. Mindful of the difficulty that officers must face in such situations, I conclude that defendants had enough credible evidence before them to reasonably conclude that they had probable cause to arrest plaintiff, and that they are therefore entitled to qualified immunity.

## IV. Malicious Prosecution Claim Against Peglow

I also find that plaintiff's malicious prosecution claim against Peglow must be dismissed. Plaintiff has established the first two elements of this claim, *i.e.*, the commencement or continuation of a criminal proceeding by defendant against plaintiff, *see Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir.1994) (troopers commenced criminal proceeding against plaintiff by formally charging him with violating state statute and having him arraigned before town justice) (citing *Carl v. Ayers*, 53 N.Y. 14, 17 (1873)) (warrantless arrest followed by information and preliminary hearing before a magistrate constitutes commencement), and the termination of the proceeding in favor of the accused.

 For the reasons already stated, however, Peglow is entitled to qualified immunity with respect to the third element: the absence of probable cause for the criminal proceeding. It is true that at some point while the charges against plaintiff were pending, it became clear that Monica had made up the entire story, and that plaintiff was not guilty of the crimes

charged. There is no evidence, however, that Peglow had any involvement in the prosecution after plaintiff's initial appearance on July 19, 2000, well before Monica recanted. Even assuming-though I do not so find-that the criminal proceeding against plaintiff "continued" in the absence of even arguable probable cause, that cannot provide a basis for liability against Peglow. At the time that his involvement in the case ceased, Peglow still had a reasonable basis to believe that probable cause existed. *See Rogers*, 303 F.3d at 159 (defendant police officer was entitled to qualified immunity from malicious prosecution charge where reasonable officers could disagree as to whether probable cause to arrest plaintiffs existed and "nothing occurred between the arrest and the prosecution to alter this"); *Bonide Products, Inc. v. Cahill*, 223 F.3d 141, 145 (2d Cir.2000) ("As it was objectively reasonable for Clarke to believe that he had probable cause to file an [Environmental Conservation Appearance Ticket] against Bonide, we need not consider the other elements of the malicious prosecution claim"); *see also Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217–18 (2d Cir.2000) (transit authority official had qualified immunity from suit on claim for malicious prosecution arising from plaintiff's arrest for misuse of bridge and tunnel tokens, since "it was objectively reasonable for [defendant] to believe that he came within the safe harbor for the 'mere reporting' of suspected crime," and "[t]here [wa]s no evidence ... suggesting that after [defendant] completed his report to the police on August 2, he did anything further with respect to Rohman's arrest or prosecution")..

 I also find that plaintiff has presented no evidence from which a jury could find actual malice. Although this element can be established by showing

that the defendant was motivated by spite or ill will, *Boose v. City of Rochester*, 71 A.D.2d 59, 70, 421 N.Y.S.2d 740 (4th Dep't 1979), New York law "does not require a plaintiff to prove that the defendant was motivated by spite or hatred, . . . [r]ather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978) (quoted in *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir.1994)).

 No such showing has been made here. Though plaintiff argues that "if Mr. Donovan is to be believed, [the charges against him] were driven by malice," Plaintiff's Memorandum of Law at 5, at the summary judgment stage, he cannot simply rest on a bare allegation to that effect, or on his subjective belief. There is no evidence that Peglow had any personal animus toward plaintiff, or that he acted with "a reckless or grossly negligent disregard of the plaintiff's rights." *Hernandez v. State*, 228 A.D.2d 902, 904, 644 N.Y.S.2d 380 (3d Dep't 1996); *Boose*, 71 A.D.2d at 70, 421 N.Y.S.2d 740. Nor was probable cause to initiate a proceeding " 'so totally lacking' [that] malice [may] reasonably be inferred." *Sulkowska v. City of New York*, 129 F.Supp.2d 274, 295 (S.D.N.Y. 2001) (quoting *Martin v. City of Albany*, 42 N.Y.2d 13, 17, 396 N.Y.S.2d 612, 364 N.E.2d 1304 (1977)).[11]

### CONCLUSION

Defendants' motion for summary judgment (Docket # 23) is granted, and the complaint is dismissed.

Plaintiff's cross-motion for summary judgment (Docket # 29) is denied.

IT IS SO ORDERED.

---

**11.** I am also not convinced that plaintiff has established the fifth element needed for a § 1983 claim based on malicious prosecution: a post-arraignment deprivation of liberty. *See Singer*, 63 F.3d at 116–17. Plaintiff stated at his deposition that he appeared in court in connection with the charges against him on one occasion following his arraignment. DDT at 78–79. The complaint indicates that this occurred on August 3, 2000, when the charges were waived by the court for action by a grand jury. Complaint ¶ 15.

Being required to appear in court, or to remain in New York State while charges are pending (which is generally required of criminal defendants released on their own recognizance, *see Rohman*, 215 F.3d at 216 (citing N.Y.Crim. Proc. L. § 510.40)), is ordinarily sufficient to establish this element. *See id.* (where plaintiff alleged that he was required, as a condition of his post-arraignment release,

to return to court on at least five occasions before charges against him were ultimately dropped, "these alleged limitations on his liberty, which as pleaded go beyond the fact of the arraignment itself, are enough, at least at the pleading stage, to implicate the Fourth Amendment"); *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir.1997) (requiring accused citizen to make periodic court appearances constitutes "seizure" under the Fourth Amendment), *cert. denied*, 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998).

Aside from these two references to the August 3 court appearance, plaintiff has failed to address this Fourth Amendment aspect of his claim. Since I find that his malicious prosecution claim must be dismissed on other grounds, however, it is unnecessary for me to decide whether this element has been established.